IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **DARIUS EGGLESTON** <br> **1624 North Caroline Street** <br> **Baltimore Maryland 21213,** | * <br><br> * | |
| **Plaintiff,** | * | |
| v. | * | Civil Action No. _____ |
| **JOHNS HOPKINS HEALTH SYSTEM** <br>   **CORPORATION,** | * <br><br> * | |
| <u>**Serve on Resident Agent**</u>: | * | |
| **CSC-LAWYERS INCORPORATING** <br>   **SERVICE COMPANY** <br> **7 N. St. Paul Street** <br> **Baltimore, Maryland 21202** | <br> * <br><br> * | |
| **Defendant.** | * <br><br> * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### **PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Darius Eggleston, by and through the undersigned attorney, hereby sues the Defendant Johns Hopkins Health System Corporation (hereinafter referred to as variously as "Employer" or "Hopkins" and/or "Hospital") for employment discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e, *et seq.* and the Family Medical Leave Act (hereinafter referred to as "FMLA"}, 29 U.S.C. §§ 1601, *et seq*.

Plaintiff contends that Defendant Employer discriminated against him by targeting him for enhanced scrutiny to find a pretextual cause for terminating his employment to disguise its true unlawful motivations to terminate his employment because of his race and religion, and because he had previously filed a charge of discrimination complaining of the conduct of these

same managers who had been involved in his prior discrimination charge. In support of this action, which he prays in relevant part be tried before a jury, Plaintiff alleges as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action in accordance with 28 U.S.C. §§ 1331 and 1343, in that this action, in part, arises under the Constitution of the United States and the laws of the United States and asserts a violation of civil rights secured by the United States Constitution and by federal law.

2. Venue is proper in this Court in accordance with 28 U.S.C. § 1391(b) because the Plaintiff's causes of action arose within the District of Maryland. In addition, there is no other district within which this action may be brought, and the Defendant Employer is located within the State of Maryland.

## THE PARTIES

3. Plaintiff Eggleston is an African American male who, at the time of the events recounted herein, was an employee of the Defendant Employer. Specifically, he was employed in the Johns Hopkins Health System Power Plant/ Facility Department as a Skill Worker. At the time relevant to the allegations of this Complaint, Plaintiff was a follower of the Islamic religion, and was so known within the workplace as a follower of Islam. Throughout the time of the circumstances herein alleged, the Plaintiff has resided and continues to reside in the State of Maryland within Baltimore City.

4. Defendant Johns Hopkins Health System Corporation is a nonstock corporation organized under the laws of the State of Maryland, created under State law for the purpose of administering, managing, and operating Johns Hopkins Hospital. The corporate headquarters for the Defendant Employer is located at 5300 Holabird Avenue, Baltimore, Maryland 21214. The Defendant Employer openly solicits employment from members of the public, and it currently

employs individuals in excess of the number of employees set forth as the threshold provided in Title VII for the applicability of its provisions. Within the sphere of activities created for it, the Defendant Employer is responsible for supervising its personnel and administering staff for purposes of Title VII and FMLA.

## BACKGROUND FACTS

5. On or about October 17, 2011, Plaintiff Eggleston was first hired by the Defendant Employer's Environmental Service Department. Plaintiff was initially hired as a floor technician, and, after promotions in 2013, he assumed a position as a Skill Worker in the Power Plant/ Facility Department until terminated on Feb15, 2023. Through his early career with the Defendant Employer, Plaintiff Eggleston performed his assigned duties capably in the absence of any question regarding his competence to cloud or imperil his continued employment with Defendant.

6. Plaintiff Eggleston's primary job duties and responsibilities as a skilled worker was assisting the plant technicians, when needed, housekeeping duties to include floors, greasing motors and chiller maintenance. While being supervised in the Power Plant/Facility Department, he received unjustifiably bad performance evaluations midyear and yearly constantly. His two supervisors, both White males, used the Power Plant surveillance security cameras, unjustified in principle, to express negative comments, criticism, and dissatisfaction about his work tasks, to include stating that the plant technicians did a better job than he.

7. The African American employees in the Power Plant received differential treatment constantly, to include false statements and promises in the interviews with African American staff to characterize the position as an Apprenticeship Program within the career path toward becoming a stationary engineer. There was not sufficient training for the African American staff in the positions they occupied to reach the promised post of a stationary engineer, and they were

subjected to psychological harassment with the unjustified use of the Power Plants' video surveillance cameras while on duty, received poor work assignments in that they were singled out for work in the mud pit, harassed for bereavement leave documentation immediately, received poor work evaluation, midyear and yearly, and were advised only to communicate with a particular supervisor.  However, the white employees were not subject to the same treatment. They were allowed to put blue painter tape over the north power plant surveillance security camera, which was located inside of the technicians' office, they received donations and fruit baskets doing their bereavement leave, their midyear and yearly evaluations were always good and were never subject to retaliation for calling for leave from work.

      8. Beginning in 2013 and continuing through 2015, Plaintiff Eggleston began to perceive that the differential treatment he had observed applied to other Arican American staff was also being directed towards him, as he was not receiving the appropriate training to become a stationary engineer, became subject to psychological harassment from the unjustified application and use of the power plant surveillance cameras to observe him while on duty, was constantly given housekeeping duties to include floors, was given lower quality work than the White employees and unjustifiably poor work evaluations midyear and yearly.

      9. Shortly after Plaintiff Eggleston begin to work with Contractor/ Hired Stationary Technician Phil Kruer, a White male, in 2014/2015, he began to experience racist comments to include Mr. Kruer's asking Plaintiff Eggleston where he lived in the "dirty community around the hospital" and what kind of "blunts" he smoked?  By 2019 through 2023, Plaintiff Eggleston endured a pervasive pattern of discrimination by his two supervisors (Assistant Director) Phil Kruer and (Power Plant Supervisor) George Keen, Jr., both White males, based on his race and religion.  The harassment included their constantly giving Plaintiff write-ups, psychological harassment with unjust use of the Power Plant surveillance cameras, religious figures in the

4

Power Plant control room to disparage Plaintiff Eggleston for his religious observance during employee meetings. The supervisors gave Plaintiff write-ups and advised that he could no longer wear open toe shoes to pray in the plant, denied him the EID Muslim holiday, and Mr. Keen called him a "nigger" in power plant stairwell, and advised him not to go to his approved FMLA scheduled doctor's appointment. Mr. Keen also discussed their disciplinary actions against Plaintiff over the plant radio transceiver for all the plant employees to hear, and approved Plaintiff for no promotions, while these supervisors advised certain White Power Plant employees to keep an eye on Plaintiff Eggleston while on duty. These supervisors authorized no increase in salary for Plaintiff, and he was constantly advised by both supervisors to seek a transfer to another department. Last, on February 15, 2023, they terminated Plaintiff's employment. At some time prior to his termination, Plaintiff Eggleston notified Johns Hopkins Health System Human Resource Department with a written complaint, phone calls, and emails. Plaintiff Eggleston begged them to mount a full-scale investigation into his complaint of discrimination and retaliation. The Johns Hopkins Health System Human Resources Department did not come over to the Power Plant to commence a full-scale investigation; instead, they completely ignored his request and told him that they doubted his allegations of what was happening to him by his two white supervisors. The Johns Hopkins Health System Human Resources Department did nothing to remedy the situation.

    10. In 2019, Plaintiff filed a written complaint with the Baltimore, MD EEOC Field office regarding the differential treatment he received from his supervisors in the Power Plaint. This charge of discrimination was later dismissed. On January 5, 2023, Plaintiff Eggleston filed another written complaint with the Baltimore, MD field office that was later amended to charge the Employer with discrimination based on race, religion and retaliation.

11. Mr. Kruer and Mr. Keen both participated and conspired to discriminate and retaliate against Plaintiff Eggleston.  They humiliated and degraded Plaintiff Eggleston constantly while on duty.  Plaintiff Eggleston's mental health started to decline while being supervised by his two supervisors, so, in 2019, Plaintiff Eggleston went to a doctor for his mental needs.  Plaintiff Eggleston was diagnosed with major depression.  Plaintiff Eggleston could not understand why the supervisors in the Power Plant were treating him so badly.  The Power Plant had been the most important place he loved to work since he had been a young man participating with his father in the "Take Your Kid to Work Program."  The Employer's Human Resource Department was not doing little to remedy the situation.

12.  Plaintiff Eggleston applied for Intermittent FMLA leave on November 29, 2022, due to acute worsening of his depression because of the constant discrimination and retaliation he was experiencing on a daily basis from both of his supervisors.

13. Plaintiff Eggleston's doctor completed medical documentation in support of his FMLA request on February 2, 2023, because his depression had worsened.  On January 25, 2023, George Keen, Jr., advised Plaintiff Eggleston not to leave work for his approved FMLA Intermittent Leave appointment due to a write-up of Plaintiff Eggleston allegedly being out of his work area.  Plaintiff Eggleston had advised his Union representative and the Human Resources Department of this incident with Mr. Keen.  Plaintiff Eggleston's FMLA intermittent leave had commenced on November 29, 2022, supported by his doctor, Dr. Garshasb Soroosh, MD.  The FMLA leave was approved if called in several hours before an appointment.  Plaintiff Eggleston relied on the FMLA leave until his discharge.

14. Plaintiff Eggleston became concerned regarding his employment with the Defendant Employer as a result of the following incidents.  On January 10, 2022, Phillip Kruer hung up a religious figure in the Control Room that demeaned Plaintiff specifically in the practice of his

6

religion, Islam.  Plaintiff Eggleston requested Mr. Kruer take down the figure, but he refused.  Plaintiff Eggleston notified the Human Resources Department regarding Mr. Kruer's behavior.  On May 2, 2022, he denied Plaintiff his EID Muslim holiday.  Plaintiff Eggleston also was given a write-up from Mr. Kruer for calling out for leave to use for a religious observance.  On September 26, 2022, October13, 2022, and December 8, 2022, Defendant Employer took additional actions against Plaintiff Eggleston.  George Keen, Jr., approached Plaintiff Eggleston on his 15-minute break and requested that he come to his office.  When Plaintiff Eggleston asked why, Mr. Keen stated, "You want respect, Nigger?  Respect is earned."  Plaintiff Eggleston notified Human Resources of this comment via telephone and by e-mail.  George Keen, Jr. then gave Plaintiff a write-up for wearing open-toe sandals (which were a requirement of his religion, as he had done for years without adverse consequence in the workplace).  Phillip Kruer then gave Plaintiff a write-up on January 3, 2023, and added policy HR 946 re: electronic devices, because Plaintiff Eggleston was recording him.  No other employees had been issued this warning even though employees constantly used their cell phones in the workplace.  On January 3, 2023, Plaintiff Eggleston filed with the EEOC a charge of discrimination regarding Defendant Employer, and Phillip Kruer also issued him a "Letter of Expectation," emphasizing appropriate shoes for the plant and that he would continue to accommodate Plaintiff Eggleston's religious observances and requested that the Plaintiff submit the form as soon as possible.  Plaintiff Eggleston's Union representative filed a grievance about the recording incident on January 24, 2023, and on January 25, 2023, Plaintiff Eggleston received a write-up for being out of his workplace on January 13 and January 25, 2023.  George Keen. Jr. also advised Plaintiff Eggleston, on January 25, 2023 not to go to his scheduled FMLA doctor's appointment that he had been informed about at 8am that morning.  On January 26, 2023, George Keen, Jr. announced the disciplinary action taken against Plaintiff Eggleston on the plant radio; as a result,

7

Plaintiff Eggleston had to depart from duty immediately due to an extreme depressive mood.  As a result of all these actions, including Plaintiff's use of FMLA leave to visit his doctor, Defendant Employer discharged Plaintiff Eggleston from employment on February 15, 2023.

15. On January 25, 2023, George Keen, Jr. contacted Plaintiff Eggleston via a personal call to Plaintiff Eggleston's coworker's cell phone in reference to a 2pm meeting.  Plaintiff Eggleston had already notified Mr. Keen around 8am inside the Control Room that he had a scheduled weekly appointment due to his approved FMLA Intermittent Medical Leave.  Mr. Keen nonetheless proceeded with the meeting in Plaintiff's absence, despite the Defendant Employer's authorization of Plaintiff's FMLA leave to visit his doctor.

16. Mr. Keen alleged that the discharge was based on the following (3) codes of conduct HR 927-one critical violation and two major violations.  The critical violation was for falsification of records, alterations of documents and the two major violations were for unauthorized absence from work area for more than an hour and failure or refusal to perform assigned duties or carry out instructions.  Plaintiff Eggleston contended that all of these allegations were false, and, when requesting a full-scale investigation, his coworkers were not interviewed, nor was Plaintiff offered to be moved to a different department.  In addition, his supervisors used the security surveillance cameras in an unjustified manner – manipulating the output from these cameras to fit their false narrative.

17. Plaintiff Eggleston observed a pattern of disparate treatment for Black employees in the Power Plant in that these workers were not allowed career training, without having to pay for furthering their education.  There were divisions in training assignments for Whites, Blacks, and Philippino workers in the Power Plant.  Management misled Black employees to think they were hired for an apprenticeship program, but these workers received only basic training and were used principally for cleaning assignments.  There were only two Black employees remaining

assigned to the Power Plant when Plaintiff Eggleston was terminated. One Black employee left shortly thereafter, and, at present, only one Black employee remains in the Power Plant. There were no White employees terminated during Plaintiff Eggleston's employment in the Power Plant.

18. Plaintiff Eggleston was the only Muslim employee in the Power Plant. He filed two EEOC complaints and was retaliated against after the submission of these charges until the termination of his employment. In contrast, White employees Scott Borowy went from Plumbing to HVAC with no experience, William Foos went to HVAC, with no HVAC license, and John Kupchinskas went from plumbing to the Refrigeration Department with no prior experience. Each of these White employees had filed a complaint with Human Resources, and it had commenced an investigation on January 4, 2022, with no form of discrimination found, but they were each transferred to a different department in February 2022.

19. Plaintiff Eggleston filed an EEOC charge of discrimination on January 5, 2023, and timely amended the charge after Plaintiff's February 15, 2023 discharge to include that event. EEOC issued to Plaintiff notice of his right to sue on December 8, 2023. This action was timely commenced thereafter.

## CAUSES OF ACTION

### COUNT I
**(Race and Religious Discrimination in Violation of Title VII)**

20. Plaintiff realleges the assertions made in paragraphs 1 through 19 as if these paragraphs had been fully set forth herein.

21. Within a timely period, Plaintiff filed with the EEOC charges of employment discrimination, the investigation of which included the above stated allegations of race and

religion discrimination. In making these allegations, Plaintiff avers that part of the EEOC investigation proceeded in accordance with the procedural requirements of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*.

22. Defendant Employer has acted unlawfully against Plaintiff, in violation of Title VII , in that officials of the Defendant Employer proceeded to terminate Plaintiff's employment as a result of a pretextual decision to find cause for his discharge for no otherwise justifiable reason, which action was, in reality, a decision to remove Plaintiff because he happened to offend the racial and/or religious sensibilities of a number of its officials through which these officials entertained prevailing expectations that such personnel as Plaintiff represented, African American males, practicing Islam, should be accepting, without questioning of the authority that these officials embodied and that Plaintiff would not present any difficulty to the official. In so proceeding, these officials of the Defendant Employer unlawfully discriminated against Plaintiff in the following ways:

   a. Because of his membership in racial and/or religious group that they expected could manifest no power properly to question their authority, the supervisors singled Plaintiff out for otherwise unjustified criticism and discipline for his performance in the workplace in order to cause him to give up his employment.

   b. Because of his membership in a racial and/or religious group that they expected could manifest no power properly to question their authority, they singled out Plaintiff, along with the other Black employees that Plaintiff saw terminated for no otherwise justifiable cause, to terminate his employment similarly.

23. The Defendant's decision to terminate Plaintiff's position forms the culmination of a pattern of discrimination with other Black employees in the Pow,er Plant that Plaintiff had seen

officials of Defendant Employer similarly treat, unlike that accorded similarly situated White employees.

24. The actions undertaken against Plaintiff, as referred to throughout this Complaint, were undertaken because of racial and/or religious aversion by certain White managers with respect to Black personnel. As a result, Plaintiff avers, on information and belief, that officials of Defendant Employer worked in concert to deny him, for reasons of his race and/or religion, continued work in his former position.

25. In so proceeding on behalf of the Defendant Employer, certain officials of the Defendant Employer acted with malice deliberately to injure the federally protected interests of Plaintiff.

26. As a direct and proximate result of the Defendant Employer's wrongful acts, Plaintiff has suffered, and will continue to suffer, actual damages, humiliation, embarrassment, as well as pain and suffering from the actions undertaken by certain officials of Defendant Employer to discriminate against him for reasons of his race and/or religion.

WHEREFORE, Plaintiff Eggleston demands judgment against Defendant Employer for compensatory damages of Five Hundred Thousand Dollars ($500,000.00), plus legal fees, costs, expenses of suit, and any other relief, together with punitive damages of One Million Dollars ($1,000,000.00), including but not limited to, injunctive relief to afford Plaintiff the opportunity to restore his career and to protect him from any further discrimination by Defendant, in addition to such other relief that the Court or a jury deems proper.

## COUNT II
### (Unlawful Retaliation Against Plaintiff in violation of Title VII)

27. Plaintiff realleges the assertions made in paragraphs 1 through 19 as if these paragraphs had been fully set forth herein.

28. Within a timely period, Plaintiff filed with the EEOC charges of employment discrimination, the investigation of which included allegations that Plaintiff contended that he had filed an earlier charge of discrimination against the Defendant Employer and that his filing of this earlier charge factored in the motivation of the officials of the Defendant Employer in terminating his employment.

29. To the extent that the Defendant Employer had no lawfully justifiable reason to terminate Plaintiff's employment other than the impermissible reason of his race and religion, and to the extent that the Plaintiff contends that the reason given for the discharge involves an alleged absence from duty otherwise subject to leave under the FMLA previously authorized by the Defendant Employer, the Employer's prior awareness of the earlier charge of discrimination submitted by the Plaintiff renders such discharge of the Plaintiff by the Defendant unlawfully retaliatory.

30. In so proceeding on behalf of the Defendant Employer to terminate Plaintiff's employment, certain officials of the Defendant Employer acted with malice deliberately to injure the federally protected interests of Plaintiff.

31. As a direct and proximate result of the Defendant Employer's wrongful acts, Plaintiff has suffered, and will continue to suffer, actual damages, humiliation, embarrassment, as well as pain and suffering, from actions undertaken by certain officials of Defendant Department to discriminate against him for reasons of his having previously charged the Defendant with discrimination on account of his race and/or religion, thereby retaliating against him.

WHEREFORE, Plaintiff Eggleston demands judgment against Defendant Employer for compensatory damages of Five Hundred Thousand Dollars ($500,000.00), plus legal fees, costs, expenses of suit, and any other relief, together with punitive damages of One Million Dollars ($1,000,000.00), including but not limited to, injunctive relief to afford Plaintiff the opportunity

to restore his career and to protect him from any further retaliation by Defendant, in addition to such other relief that the Court or a jury deems proper.

## COUNT III
### (Violation of the FMLA, 29 USC §§ 2601, *et seq*.)

32. Plaintiff realleges the assertions made in paragraphs 1 through 19 as if these paragraphs had been fully set forth herein.

33. Within a timely period, Plaintiff filed with the EEOC charges of employment discrimination, the investigation of which included allegations that the reasons given by Defendant Employer for its termination of the Plaintiff's employment were otherwise precluded by leave that the Employer had earlier authorized under the FMLA.

34. At the time Defendant Employer terminated the Plaintiff's employment, the Plaintiff has earlier applied to Defendant for medical leave under the FMLA for authority to leave the workplace to visit his doctor treating the Plaintiff for stresses caused by the behavior of the Defendant described herein. The Defendant granted the Plaintiff's application for FMLA leave.

35. The Defendant Employer terminated Plaintiff for an alleged absence from duty coinciding with a visit to his doctor as authorized by the Employer's grant of FMLA leave. Accordingly, the termination of Plaintiff's employment constitutes a violation of the protection afforded by the FMLA.

36. In so proceeding on behalf of the Defendant Employer to terminate Plaintiff's employment, certain officials of the Defendant Employer acted with malice deliberately to injure the federally protected interests of Plaintiff.

37. As a direct and proximate result of the Defendant Employer's wrongful acts, Plaintiff has suffered, and will continue to suffer, actual damages, humiliation, embarrassment, as well as

pain and suffering, from actions undertaken by certain officials of Defendant Department to take action unlawfully against him notwithstanding the protection otherwise provided him by the FMLA.

WHEREFORE, Plaintiff Eggleston demands judgment against Defendant Employer for compensatory damages of Five Hundred Thousand Dollars ($500,000.00), plus legal fees, costs, expenses of suit, and any other relief, together with punitive damages of One Million Dollars ($1,000,000.00), including but not limited to, injunctive relief to afford Plaintiff the opportunity to restore his career and to protect him from any further violation of federal employment protections by Defendant, in addition to such other relief that the Court or a jury deems proper.

Respectfully submitted,

/s/
John H. Morris, Jr.
Trial Bar No. 00325
1210 East 33rd Street
Baltimore, Maryland 21218
(410) 366-5683

Attorney for Plaintiff Eggleston

### REQUEST FOR JURY TRIAL

Plaintiff, Darius Eggleston, by and through the undersigned attorney, hereby requests trial by jury with respect to such portions of his claim as to which he may be entitled to a jury trial.

/s/
John H. Morris, Jr.